Filed 8/7/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ARNULFO ALVAREZ et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>BAC HOME LOANS SERVICING, L.P.,<br>et al.,<br><br>    Defendants and Respondents. | A138443<br><br>(Sonoma County<br>Super. Ct. No. SCV 250225) |

**Introduction**

Plaintiffs Arnulfo and Consuelo Alvarez and Enrique and Ofelia De Haro appeal from a judgment entered in favor of defendants BAC Home Loans Servicing, L.P., Bank of America, N.A., and ReconTrust Company, N.A. (collectively Bank of America) following the sustaining of defendants' demurrer to plaintiffs' second amended complaint (the complaint) without leave to amend.[1] The complaint alleges, among other things, fraud and unfair business practices in the origination of plaintiffs' residential mortgage loans, and negligence in the subsequent servicing of the loans, including negligent review of plaintiffs' applications for loan modification. Plaintiffs contend the trial court erred in concluding that the complaint fails to allege fraud for which these defendants are responsible and in concluding that defendants owed no duty of care to the plaintiffs in the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the Introduction, part 4 of the Discussion, and the Disposition of this opinion are certified for publication.

[1] The complaint also names Meridias Capital, Inc. and certain individuals as defendants. These parties were not affected by the ruling on the demurrer, they are not parties to the appeal, and they are not included in references to "defendants" in this opinion.

review of their applications for a loan modification. Although poorly drafted, we agree that potentially meritorious claims can be distilled from the allegations of the complaint. We shall therefore reverse the judgment as to the fraud, unfair competition and negligence causes of action, but shall not preclude the trial court from entering further orders designed to clarify the relevant allegations supporting viable claims for relief.

**Factual and Procedural History**

In October 2005 and January 2006, plaintiffs refinanced real property by obtaining from Meridias Capital, Inc. (Meridias) new loans secured by their properties. Attached to the complaint as exhibits are copies of three promissory notes for loans obtained by Alvarez in October 2005 and one note for a loan to De Haro in January 2006. The notes contain the same standardized terms. The complaint also attaches a truth-in-lending disclosure statement for one of the Alvarez loans and schedules setting forth the pre-payment penalty that applies to another loan. For purposes of illustration, we set forth the key terms in the documents dated October 13, 2005, relating to Alvarez's loan number 1400041515.

The "ADJUSTABLE RATE NOTE" begins with the following capitalized disclaimer: "THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE."

The note continues:

"1. BORROWER'S PROMISE TO PAY [¶] In return for a loan that I have received, I promise to pay U.S. $412,500.00 (this amount is called 'Principal'), plus interest, to the order of Lender. . . . [¶] . . . Lender or anyone who takes this Note by transfer . . . is called the 'Note Holder.' "

"2. INTEREST [¶] (A) Interest Rate [¶] Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly

2

rate of 1.375%. The interest rate I will pay may change. [¶] The Interest rate required by this Section 2 is the rate I will pay both before and after any default . . . . [¶] (B) Interest Rate Change Dates [¶] The interest rate I will pay may change on the 1st day of December, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of Interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3. [¶] . . . [¶] (D) Calculation of Interest Rate Changes [¶] Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 075/1000 percentage point(s) 3.075% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950%. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin."

"3. PAYMENTS [¶] (A) Time and Place of Payments [¶] I will make a payment every month. [¶] I will make my monthly payment on the 1st day of each month beginning on December 1, 2005. I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. . . . [¶] . . . [¶] (B) Amount of My Initial Monthly Payments [¶] Each of my initial monthly payments . . . will be in the amount of U.S. $1,399.01 unless adjusted under Section 3(F). (C) Payment Change Dates [¶] My monthly payment may change as required by Section 3(D) below beginning on the 1st day of December, 2006, and on that day every 12th month thereafter. Each of these dates is called a 'Payment Change Date.' My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The 'Minimum Payment' is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur. [¶] I will pay the amount of my new Minimum Payment each

month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below. [¶] (D) Calculation of Monthly Payment Changes [¶] At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the 'Full Payment.' Unless Section 3(F) or 3(G) below requires me to pay a different amount, the amount of my new monthly payment effective on a Payment Change Date will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the 'Payment Cap. . . . The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change date and multiplying it by the number 1.075. The result of this calculation is called the 'Limited Payment.' Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment. [¶] (E) Additions to My Unpaid Principal [¶] Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A). [¶] (F) Limit on My Unpaid Principal; Increased Monthly Payment [¶] My unpaid Principal can never exceed a Maximum Limit equal to 115.00 percent of the Principal amount I originally borrowed. My unpaid Principal could

4

exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate. [¶] (G) Required Full Payment [¶] On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date."

Plaintiffs also attached a document entitled "PREPAYMENT PENALTY ADDENDUM" which provides in relevant part, "If within the first THIRTY-SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of This note."

The complaint also attaches a "Federal Truth-In-Lending Disclosure Statement," which includes the following information in a series of boxes near the top of the form: "ANNUAL PERCENTAGE RATE [¶] The cost of your credit at a yearly rate [¶] 6.887%"; "FINANCE CHARGE [¶] The dollar amount the credit will cost you. [¶] $659,531.34"; "Amount Financed [¶] The amount of credit provided to you or on your behalf. [¶] $410,041.41"; and "Total of Payments [¶] The amount you will have paid after you have made all payments as scheduled. [¶] $1,069,572.75." The statement also displays the following payment schedule:

5

| Number of Payments | Amount of Payment | When Payments Are Due |
|---|---|---|
| 1 | 1,399.01 | 12/01/05 |
| 11 | 1,399.01 | 01/01/06 |
| 12 | 1,503.94 | 12/01/06 |
| 12 | 1,616.74 | 12/01/07 |
| 12 | 1,738.00 | 12/01/08 |
| 12 | 1,868.35 | 12/01/09 |
| 299 | 3,240.21 | 12/01/10 |
| 1 | 3,237.48 | 11/01/35 |

The statement indicates that the loan includes a "VARIABLE RATE FEATURE" and explains: "Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier."

Shortly after the loan documents were signed, Meridias transferred the loans to "Countrywide,"[2] which later became a subsidiary of Bank of America.

In 2008, plaintiffs noticed that despite making the required minimum monthly payments on their loans, the principal owing on the loans was increasing. At that point, they began "working with Bank of America in trying to get a loan modification." After two years, plaintiffs' requests for modification were denied and default notices were recorded on their properties.

In July 2012, plaintiffs filed their second amended complaint alleging three causes of action pertinent to this appeal. The first and sixth causes of action, for fraud and for violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) allege that they were induced to obtain the loans by misrepresentations and concealment of material facts. The second cause of action alleges that Bank of America failed to exercise reasonable care in processing their applications for loan modifications. Although

---

[2] The precise Countrywide entity to which the loans were transferred is not made clear in the complaint. See part 1.B.(2) of the Discussion, *post.*

the complaint does not indicate whether foreclosure sales have yet occurred with respect to all of the encumbered properties, it does allege the foreclosure of at least one residence, and the prayer seeks multiple forms of relief, including declarations of rights, injunctions, restitution and damages.

Defendants demurred to the complaint arguing, as to the three causes of action in question, that plaintiffs failed to allege facts on which the Bank of America entities could be held liable for the fraud or unlawful business practices of Meridias in connection with the origination of the loans, and that defendants did not owe plaintiffs a duty to modify their loans. The trial court sustained defendants' demurrer to all but one of the causes of action. Following plaintiffs' stipulation to the entry of judgment in favor of defendants on the remaining cause of action, a final judgment was entered and plaintiffs timely filed a notice of appeal. Plaintiffs address their arguments on appeal to the first, second and sixth causes of action, and do not challenge adverse rulings relating to other causes of action.

**Discussion**

1.    <u>Plaintiffs have alleged a cause of action for fraud against defendants</u>.

As a gross understatement, plaintiffs' complaint is not well drafted. The factual allegations relating to the fraud cause of action are spread throughout the complaint, interspersed with allegations having little relevance to these claims. Moreover, some of the most significant allegations are not stated in the body of the complaint but are incorporated by reference to two complaints in separate actions against Countrywide and related entities. One of these pleadings attached as an exhibit to plaintiffs' complaint is a complaint filed by the California Attorney General and the other is a complaint filed by the United States Department of Justice. Had the trial court sustained a demurrer on the ground of uncertainty or admonished plaintiffs to clarify the pleading, one could hardly object, and we do not preclude the trial court from taking such action on remand. However, before us is a ruling on a general demurrer, questioning whether any facts are alleged on which relief may be granted. Despite the considerable confusion in the pleading, the complaint does allege such facts.

7

There are three distinct issues that must be considered in evaluating the sufficiency of the fraud cause of action: Does the complaint allege actionable misrepresentations or concealment? If so, does the complaint allege facts establishing the responsibility of Countrywide for those misstatements? And if so, does the complaint allege facts establishing the liability of Bank of America? We consider these questions in turn.

**A.     The complaint alleges that the loan documents concealed the terms of plaintiffs' loans.**

The sufficiency of plaintiffs' allegations to state claims for fraud and violation of the UCL is fully explained in *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230 (*Boschma*), a decision addressing identical claims arising out of the use of loan documents virtually identical to those in the present case. That opinion rightly finds support for its conclusions under comparable federal law and authority. We agree fully with the court's analysis in *Boschma.*

" ' "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." ' [Citation.] Fraud must be pleaded with specificity rather than with ' "general and conclusory" ' allegations." (*Boschma*, *supra,* 198 Cal.App.4th at p. 248.)

In *Boschma*, the court held the "loan documents failed to adequately and accurately disclose essential terms of the loans, namely that plaintiffs would suffer negative amortization if they made monthly payments according to the only payment schedule provided to them prior to the closing of the loan." (*Boschma*, *supra,* 198 Cal.App.4th at p. 234.) The court explained that "[t]he root of the alleged deficiencies in defendant's disclosures is defendant's use of a significantly discounted 'teaser' rate rather than an initial rate set near the rate that would result from the application of the variable

8

rate formula in the Note (an index plus 3.5/3.25 percent). The teaser rate creates an artificially low (compared to the actual cost of credit) initial payment schedule and guarantees that the actual applicable interest rate (after the first month of the loan) will exceed the interest rate used to calculate the payment schedule for the initial years of the loan. If the initial interest rate were set using the Note's variable rate formula, it would actually be possible that interest rates would adjust downward (or stay the same) after the first payment and no negative amortization would occur. In other words, the disclosures' conditional language is accurate absent a significantly discounted rate. An Option ARM loan without a teaser rate would result in a higher initial interest rate, higher initial minimum payments pursuant to the payment schedule, and a much narrower gap (even if interest rates increased) between the borrower's payment 'options.' Of course, without a teaser rate, the surface attractiveness of Option ARMs would have been greatly diminished precisely because the stated (initial) interest rate and (initial) payment would be higher." (*Id*. at pp. 249-250.) "Keeping in mind the procedural posture of this case," the court concluded that "plaintiffs have adequately pleaded that material facts were concealed by inaccurate representations and half-truths. If plaintiffs can show defendant intentionally used its Option ARM forms to deceive borrowers, plaintiffs may be able to establish a fraud claim. Plaintiffs' actual interest rates and monthly payments sufficient to amortize the loan (or at least pay the accruing interest) were hidden in the complexity of the Option ARM contract terms." (*Id*. at p. 249.)

Here, as in *Boschma*, plaintiffs allege, "The gravamen of plaintiffs' operative complaint is that the defendants, failed to disclose prior to plaintiffs entering into their Option ARMs that: [¶] (a) the loan[s] were designed to cause negative amortization to occur; [¶] (b) the monthly payment amounts listed in the loan documents for the first two to five years of the loans were based entirely upon a low 'teaser' interest rate which existed for only a single month and which was substantially lower than the actual interest rate that would be charged, such that these payment amounts would never be sufficient to pay the interest due each month; [¶] (c) when [plaintiffs] followed the contractual payment schedule in the loan documents, negative amortization was certain to occur,

resulting in a significant loss of equity in borrowers' homes, and making it much more difficult for borrowers to refinance the loans [because of the prepayment penalty included in the loan for paying off the loan within the first three years of the loan]; thus, as each month passes, the homeowners would actually owe more money than they did at the outset of the loan, with less time to repay it." As *Boschma* holds, plaintiffs have sufficiently alleged the concealment of material facts.

Also, as in *Boschma*, plaintiffs have satisfied the heightened pleading standard for a fraud claim by attaching copies of their notes and truth in lending disclosure statements to their complaint. In *Boschma*, the court explained, "with regard to the alleged fraudulent omissions at issue, the enhanced pleading burden of a fraud claim is met by the attachment of the relevant Option ARM documents: '[P]laintiffs' evidence is the mortgage instrument, which provides the specific content of the allegedly false representations related to negative amortization, as well as the date and place of the alleged fraud. While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents.' " (*Boschma*, *supra,* 198 Cal.App.4th at p. 248.) While defendants point out that plaintiffs' attachments are not complete insofar as they have attached only one truth in lending disclosure statement and the copies of their notes are not signed, for purposes of demurrer, the documents attached are sufficient to illustrate the alleged fraud.

Like the trial court, we reject defendants' argument that the complaint fails to sufficiently allege reliance and damages. In *Boschma, supra,* 198 Cal.App.4th at pages 250-251 the court states, "Reliance can be proved in a fraudulent omission case by establishing that 'had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently.' [Citation.] Plaintiffs have alleged this fact; it would be improper to adjudicate the factual question of plaintiffs' actual reliance at the demurrer stage. Moreover, given our analysis of the loan documents, we reject the contention that the disclosures actually given to plaintiffs preclude reasonable reliance." (Fn. omitted.) As in *Boschma*, plaintiffs here have alleged that they "relied on the

10

misrepresentations or nondisclosures and would not have entered the transaction[s] but for the misrepresentations or nondisclosures."

Accordingly, we conclude that the allegations of the complaint state causes of action for fraud.

**B.     Plaintiffs have alleged facts establishing defendants' liability for the alleged fraud.**

Defendants contend that the complaint "fails to state a claim for fraud against the [Bank of America] defendants because the actions at issue are alleged to have been performed by Meridias and the individual defendants . . . not by Bank of America or ReconTrust." Defendants' argument is based on the mistaken premise that "the sole basis for the plaintiffs purported claims against the [Bank of America] defendants is that . . . the loans obtained by plaintiffs were subsequently transferred to Countrywide." While plaintiffs do make the argument that Countrywide, as the assignee of plaintiffs' promissory notes, became liable for fraud committed by Meridias, their claim is also based on the assertion that Countrywide is directly liable as an aider and abettor of the fraud. Defendants simply ignore and mischaracterize the allegations of the complaint. The complaint alleges that Countrywide is directly liable for the fraud because it dictated use of the deceptive loan documents by Meridias and directly engaged in deceptive marketing of the Option ARM loans.  As the alleged successor in interest to Countrywide, Bank of America has assumed Countrywide's liability.

(1). The complaint alleges that Countrywide is liable as an aider and abettor of the fraud.

The complaint alleges that "Countrywide and Meridias were 'business partners.' Countrywide closely monitored and controlled the 'business partners' with whom it worked . . . . [¶] MERIDIAS had an ongoing business relationship with COUNTRYWIDE where MERIDIAS would originate mortgage loans . . . according to the terms set in place by COUNTRYWIDE [¶] . . . COUNTRYWIDE required that MERIDIAS provide mortgage loans to borrowers in accordance [with] the payment option adjustable rate mortgages that are the subject of this action."  The complaint alleges that Meridias "transferred mortgage loans [to Countrywide], including those that

11

are the subject of this action immediately after origination, usually in a matter of days" and that Countrywide "ratified, approved, and authorized the acts of [Meridias] with full knowledge of [the] facts" and aided and abetted in the commission of wrongful acts by Meridias.

The complaint also alleges that "Countrywide aided and abetted Meridias Capital's [fraud] by using deceptive marketing and deceptive loan products as described in an action by the Attorney General of the State of California and in an action by the United States Department of Justice." The complaints in those actions, attached as exhibits to plaintiffs' complaint, contain extensive factual allegations of Countrywide's "false advertising and unfair competition in the origination of residential mortgage loans." Among other things, the complaint filed by the State of California alleges "Countrywide deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate. Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan. Television advertisements did not effectively distinguish between the 'payment rate' and the interest rate on the loans, and any warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type." The California complaint alleges further that "Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations." Countrywide instructed its loan officers "to 'build rapport' and 'gain trust' in conversations with potential customers, and to do so with existing customers by 'positioning' telephone calls, the true purpose of which was to sell refinance loans, as 'Customer Service loan check-up[s].' " Loan officers were instructed to tell customers, " 'I'm an experienced mortgage lending professional specializing in helping people improve their financial situation.' " Plaintiffs' complaint alleges that a Meridias loan agent approached Alvarez and told him he "was working with a company that could review his loan documents and perhaps put him into better loans and help him financially." Later, he was told that "the new loans were better than the one he was in."

12

In *Peel v. BrooksAmerica Mortg. Corp.* (C.D.Cal. 2011) 788 F.Supp.2d 1149, 1161, the court rejected a challenge to the sufficiency of a similar complaint. The court explained, " 'California has adopted the common law rule that liability may be imposed on one who aids and abets the commission of an intentional tort if the person knows the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act.' [Citation.] Aiding and abetting requires 'actual knowledge of the primary violation.' [Citation.] It also requires 'substantial assistance' with the violation. [Citation.] Here, Plaintiffs have alleged that [defendants] drafted the Loan Documents which omit the material information, and required [the original lender] to use these documents in originating loans that [defendants] would respectively purchase and then securitize. Therefore, the Court concludes that, at this stage, Plaintiffs have sufficiently stated a claim for aiding and abetting liability." (See *Jordan v. Paul Fin., LLC* (N.D.Cal. 2010) 745 F.Supp.2d 1084, 1097 [upholding fraud claim based on allegations that the assignee of a mortgage loan " 'actively participated in creating, designing and formulating the Loan Documents and/or dictated the terms of the Option ARM loans sold to Plaintiffs,' that the assignee reviewed loan portfolios " 'for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing' " and that the assignee has the right to underwrite the loans and review the mortgage files at issue in that case].)

As in *Peel* and *Jordan*, plaintiffs' complaint sufficiently alleges Countrywide's liability for fraud based on a theory of aiding and abetting. (*Peel v. BrooksAmerica Mortg. Corp.*, *supra*, 788 F.Supp.2d at p. 1161 and *Jordan v. Paul Fin., LLC, supra*, 745 F.Supp.2d at p. 1097, fn. 14.) Therefore, we need not consider plaintiffs' alternative contention that the defendants are also liable as subsequent assignees of the loans. (See *Peel v. BrooksAmerica Mortg. Corp.*, *supra*, 788 F.Supp.2d at p. 1161; *Jordan v. Paul Fin., LLC, supra*, 745 F.Supp.2d at p. 1097, fn. 14 ["Plaintiffs also assert that defendant [] is liable as an assignee of the Goldhabers' loan because an assignee 'stands in the shoes' of the assignor. [Citation.] Because the Court concludes that plaintiffs are entitled

13

to pursue a fraudulent omissions claim against [defendant] under a theory of aiding and abetting and joint venture liability, the Court does not decide whether [defendant] may be liable as an assignee."].)[3]

(2). Bank of America is liable for fraud committed by Countrywide as its successor.

Bank of America argues, for the first time on appeal, that it assumed no liability of Countrywide when Countrywide merged with Bank of America. Defendants argue that "plaintiffs' allegations do not sufficiently reflect the relationship between Countrywide and Bank of America, N.A. Plaintiffs allege, generally, that 'Countrywide' was a 'business partner' with Meridias, and that 'Countrywide' directed the loan origination of Meridias . . . [b]ut, plaintiffs have not named lender Countrywide Home Loans, Inc. as a defendant in this action. Instead, Plaintiffs attempt to argue that because the servicing of their loan was transferred to Countrywide Home Loans Servicing, LP, which merged in to BAC Home Loan Servicing LP, which later merged in to Bank of America, N.A., that [Bank of America N.A.] should now be liable for alleged conduct of Countrywide Home Loans, Inc., which remains a separate and distinct legal entity." Plaintiffs did not, however, allege that their loans were transferred to Countrywide Home Loans Serving, LP. Although the complaint alleges that defendant BAC Home Loans Servicing, LC, a subsidiary of Bank of America, was formerly known as Countrywide Home Loans Servicing, LP, the complaint never defines the term "Countrywide" as it is used throughout the pleading. In responding to defendants' new argument, plaintiffs explain they were told only that their loans were transferred to "Countrywide." At this stage in the litigation, "[t]he precise Countrywide entity is still unknown" and they "are entitled to

---

[3] We do not necessarily agree with defendants that the decision in *LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 983 supports their assertion that "in order for an assignee to be held liable for the acts of the assignor, a plaintiff must allege facts that establish a close connection between the assignee and assignor," but the question has no bearing on a claim based on the direct liability of the assignee as an aider and abettor of the assignor's fraud. For the same reason, defendants' reliance on statutory limits on the liability of assignee-lenders or assignee-servicers under the Truth in Lending Act is also misplaced.

14

assume that 'Countrywide' means Countrywide Bank, which is now Bank of America, N.A." Plaintiffs have incorporated by reference the detailed allegations regarding the relationship between the various Bank of America and Countrywide entities found in the complaint filed by the federal government.[4] As plaintiffs note, "[s]hould discovery prove that another Countrywide or Bank of America entity should be added to the complaint, Plaintiffs can easily seek to amend the complaint to add Countrywide Financial Corporation, Countrywide Home Loans Inc. or Bank of America Corporation." Since plaintiffs are seeking a judgment against Bank of America and not against any former

---

[4] The complaint filed in *United States v. Countrywide Financial Corporation et al.*, case No. CIV11-10540, alleges in relevant part as follows: "During the period of time relevant to the events at issue in this Complaint through July 1, 2008, Defendant Countrywide Financial Corporation ('CFC') was a Delaware-incorporated financial holding company or savings and loan holding company with its principal business office in Calabasas, California. CFC created, authorized, and or ratified the lending-related policies and practices at issue in this Complaint that its divisions and subsidiaries implemented. [¶] . . . On July 1, 2008, Bank of America Corporation ('BAC'), a Delaware-incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities. Since that acquisition, CFC has remained a Delaware-incorporated company with its principal business office in Calabasas, California, as a direct, wholly-owned subsidiary of BAC. [¶] . . . Defendant Countrywide Home Loans, Inc. ('CHL') is a New York-incorporated wholly-owned subsidiary of CFC with its principal business office in Calabasas, California. . . . CHL became a wholly-owned indirect subsidiary of BAC on or about July 1, 2008, as a result of BAC's acquisition of CFC. [¶] . . . Countrywide Bank ('CWB') was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company CFC. . . . [¶] . . . Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide." [¶] . . . Even after BAC's purchase of CFC on July 1, 2008, CWB continued its banking and mortgage lending operations as a direct subsidiary of CFC, using the same loan origination policies and procedures, until approximately November 7, 2008. At that time, BAC engaged in a series of corporate transactions that ended CWB's status as a subsidiary of CFC and made CWB a direct subsidiary of BAC. [¶] . . . On April 23, 2009, the Office of the Comptroller of the Currency approved . . . the request by Bank of America, N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist. Bank of America, N.A. was the surviving institution resulting from this merger. Thus, Bank of America, N.A. is the successor in interest to CWB."

15

Countrywide entity, there is no need to have named a particular Countrywide entity as a defendant in the action.

Defendants also rely on the "general rule of successor *nonliability* [which] provides that where a corporation purchases, or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities." (*Fisher v. Allis-Chalmers Corp. Product Liability Trust* (2002) 95 Cal.App.4th 1182, 1188.) However, this rule does not apply if, among other things, "the transaction amounts to a consolidation or merger of the two corporations." (*Ibid.*) The allegations regarding the mergers between Bank of America and Countrywide set forth in the federal complaint are sufficient to defeat a challenge on the pleadings to defendants' successor liability.

2. Plaintiffs' fraud claims are not barred by the statute of limitations.

Actions for damages based on fraud must generally be filed within three years after actual or constructive discovery of the fraud. (Code Civ. Proc., § 338, subd. (d).). Plaintiffs allege that they discovered the fraud on or about December of 2008. Their original complaint was filed on August 23, 2011, within three years after the alleged date of discovery. Contrary to defendants' argument, we cannot say as a matter of law that plaintiffs would have discovered the purported fraud earlier through reasonable diligence. While defendants are correct that plaintiffs had an obligation to read their contracts, the complaint alleges that the loan documents were intentionally designed to deceive and defraud borrowers. As the court in *Boschma* observed, "Plaintiffs' actual interest rates and monthly payments sufficient to amortize the loan (or at least pay the accruing interest) were hidden in the complexity of the Option ARM contract terms. [¶] . . . The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he [or she] transacts business. Laws are made to protect the trusting as well as the suspicious. [T]he rule of *caveat emptor* should not be relied upon to reward fraud and deception." (*Boschma*, *supra*, 198 Cal.App.4th at p. 249.)

16

Accordingly, the court erred in sustaining defendants demurrer to plaintiffs' first cause of action for fraud.

3. <u>Plaintiffs have alleged a cause of action under the UCL.</u>

The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Having concluded that the complaint alleges a cause of action for fraud against defendants, the same allegations are sufficient to allege a cause of action under the UCL based on defendants' fraudulent conduct. (See *Boschma, supra*, 198 Cal.App.4th at pp. 252-254.)

Defendants' additional arguments in support of their demurrer are without merit. The UCL claim is not untimely. The time to file a cause of action for unfair competition based on allegedly fraudulent conduct "starts to run only when a reasonable person would have discovered the factual basis for a claim." (*Broberg v. Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920-921.) As discussed above, plaintiffs have alleged delayed discovery sufficient to overcome the demurrer. Similarly, for the reasons discussed above, the cause of action is not defeated by defendants' assertion that they cannot be held responsible for fraud committed by Meridias. Finally, the complaint alleges that plaintiffs suffered harm sufficient to establish standing under the UCL. The allegations regarding the foreclosure of at least some of plaintiffs' properties, as well as the allegations of lost equity, are sufficient to allege, if not to prove, economic injury under section 17200. (*Boschma, supra*, 198 Cal.App.4th at p. 254; see *Rosenfeld v. JPMorgan Chase Bank, N.A.* (N.D.Cal. 2010) 732 F.Supp.2d 952, 973; *Sullivan v. Wash. Mut. Bank, FA* (N.D.Cal. Oct. 23, 2009, No. C-09-2161) 2009 U.S. Dist. LEXIS 104074 at pp. *4-5; *Rabb v. BNC Mortg., Inc.* (C.D.Cal. Sept. 21, 2009, No. CV 09-4740 AHM (RZx)) 2009 U.S. Dist. LEXIS 92061, at p. *2.)

4. <u>The complaint alleges a cause of action for negligence in the servicing of plaintiffs' loans</u>.

"To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries. [Citation.] Whether a duty of care

17

exists is a question of law to be determined on a case-by-case basis. [Citation.] [¶] We start by identifying the allegedly negligent conduct by [defendants] because our analysis is limited to 'the specific action the plaintiff claims the particular [defendant] had a duty to undertake in the particular case.' " (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62.)

Contrary to defendants' characterization, plaintiffs do not allege that defendants owed plaintiffs a duty to offer or approve a loan modification. Rather, they allege that defendants owed them a duty to exercise reasonable care in the review of their loan modification applications once they had agreed to consider them. The complaint alleges (albeit awkwardly) that defendants "undertook to review" plaintiffs' loans for potential modification under the federal Home Affordable Modification Program (HAMP) and that having done so they owed plaintiffs the duty to exercise reasonable care in processing and reviewing their applications for loan modifications in accordance with the federal HAMP guidelines. The complaint alleges that defendants breached this duty by (1) failing to review plaintiffs' applications in a timely manner, (2) foreclosing on plaintiffs' properties while they were under consideration for a HAMP modification and (3) mishandling plaintiffs' applications by relying on incorrect information. With respect to the mishandling of the applications, the complaint alleges that between February and April 2011, Alvarez was told by an employee of defendants named in the complaint that his application for modification of the loan secured by his primary residence had been rejected because his monthly gross income of $2,554.75 was inadequate, whereas his paystubs showed that his monthly gross income was $6,075. With respect to the loan on one of his rental properties, he was told that his application showed a $6,318.98 deficit in monthly income, while Alvarez alleges that there was no such deficit. With respect to the loan on his second rental property, the complaint alleges that defendants falsely advised him that no documents had been submitted for review when in fact documents were sent to and received by defendants. De Haro alleges that after working with defendants for over two years to obtain a loan modification, defendants advised him "that the second lien holder prevented the modification from taking place," which was false.

18

As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1095-1096, citing *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34-35 [A "special relationship" between a lender and borrower exists only in those situations "when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.' "]; see *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 206 ["No fiduciary duty exists between a borrower and lender in an arm's length transaction"].) However, "[e]ven when the lender is acting as a conventional lender, the no-duty rule is only a general rule." (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 901 (*Jolley*).) " '*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower. Rather, the *Nymark* court explained that the question of whether a lender owes such a duty requires "the balancing of the '*Biakanja* factors.' " ' " (*Id.* at p. 901.)[5] Citing recent federal authority, the court in *Jolley* agreed with the observation that "*Nymark* and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money." (*Id.* at p. 902, citing *Ottolini v. Bank of America* (N.D.Cal., Aug. 19, 2011, No.

---

[5] These balancing factors, as recognized in *Nymark,* " ' "are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." ' " (*Nymark v. Heart Fed. Savings & Loan Assn., supra,* 231 Cal.App.3d at p. 1098, quoting *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650.) The continuing applicability of these factors has most recently been reconfirmed, in a different context, in *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568. There our Supreme Court held that the three considerations driving the analysis upholding the existence of a duty were "(1) the closeness of the connection between defendants' conduct and plaintiff's injury; (2) the limited and wholly evident class of persons and transactions that defendants' conduct was intended to affect; and (3) the absence of private ordering options that would more efficiently protect [the affected parties from the harm done in that case]." (*Id.* at p. 581.)

C-11-0477 EMC) 2011 U.S. Dist. Lexis 92900, p. *16.) In their appellate brief, defendants relied heavily on an appellate decision disagreeing with the views expressed in *Jolley,* but that opinion has subsequently been depublished by the Supreme Court. (*Aspiras v. Wells Fargo Bank, N.A.* (Aug. 21, 2013, D061449) review den. and opn. ordered nonpub. Jan. 15, 2014, S214277.)

In *Lueras v. BAC Home Loans Servicing, LP*, *supra*, 221 Cal.App.4th at page 67 the court held that a lender does not owe a borrower a common law duty "to offer, consider or approve" a loan modification. The court upheld an order sustaining a demurrer to a cause of action for negligence, explaining that "a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money. A lender's obligations to offer, consider, or approve loan modifications and to explore foreclosure alternatives are created solely by the loan documents, statutes, regulations, and relevant directives and announcements from the United States Department of the Treasury, Fannie Mae, and other governmental or quasi-governmental agencies. The *Biakanja* factors do not support imposition of a common law duty to offer or approve a loan modification. If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct. If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." (*Id*. at p. 67.)

The court in *Lueras*, however, granted plaintiffs leave to amend to allege a cause of action for negligent misrepresentation. The court held that while a lender does not have a duty to offer or approve a loan modification, "a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale." (*Lueras v. BAC Home Loans Servicing, LP.* at p. 68.) The court explained, "It is foreseeable that a borrower might be harmed by an inaccurate or untimely communication about a foreclosure sale or about the status of a loan modification application, and the connection

20

between the misrepresentation and the injury suffered could be very close." (*Id.* at pp. 68-69.)

The opinion in *Lueras* cited numerous federal district court opinions that conclude a lender owes no duty of care to a borrower to modify a loan. (*Lueras v. BAC Home Loans Servicing, LP, supra*, 221 Cal.App.4th at pp. 64-65.)[6] The court also cited other district court decisions recognizing that a lender does owe a borrower a duty of care in negotiating or processing an application for a loan modification. (*Id.* at pp. 64-65.) [7]

---

[6] The opinion cites *Armstrong v. Chevy Chase Bank*, *FSB* (N.D.Cal., Oct. 3, 2012, No. 5:11–cv–05664 EJD) 2012 U.S. Dist. Lexis 144125, pp. *11–*12 ["[A] loan modification, which at its core is an attempt by a money lender to salvage a troubled loan, is nothing more than a renegotiation of loan terms. This renegotiation is the same activity that occurred when the loan was first originated; the only difference being that the loan is already in existence. Outside of actually lending money, it is undebatable that negotiating the terms of the lending relationship is one of the key functions of a money lender."]; *Diunugala v. JP Morgan Chase Bank, N.A.* (S.D.Cal., Oct. 3, 2013, No. 12cv2106–WQH–NLS) 2013 U.S. Dist. Lexis 144326, p. *10 ["Absent 'special circumstances,' there is no duty for a servicer to modify a loan."]; *Sanguinetti v. CitiMortgage, Inc.* (N.D.Cal., Sept. 11, 2013, No. 12–5424 SC) 2013 U.S. Dist. Lexis 130129, p. *17 ["Loan modifications are part of the lending process, and negotiating a lending agreement's terms is one of a bank's key functions."]; *Bunce v. Ocwen Loan Servicing, LLC* (E.D.Cal., July 17, 2013, No. CIV. 2:13–00976 WBS EFB) 2013 U.S. Dist. Lexis 100111, p. *15, [lender does not owe duty in loan modification activities]; *Kennedy v. Bank of America, N.A.* (N.D.Cal., Apr. 26, 2012, No. 12–CV–952 YGR) 2012 U.S. Dist. Lexis 58636, pp. *21–*22 [lender owes borrower no duty of care in process of approving loan modification]; *Dooms v. Federal Home Loan Mortgage Corp.* (E.D.Cal., Mar. 31, 2011, No. CV F 11–0352 LJO DLB) 2011 U.S. Dist. Lexis 38550, p. *28 ["The [lender] owed no duty of care to [the borrower] arising from her default, property foreclosure, and loan modification attempts."]; *DeLeon v. Wells Fargo Bank, N.A.* (N.D.Cal., Oct. 22, 2010, No. 10–CV–01390–LHK) 2010 U.S. Dist. Lexis 112941, p. *12 [the defendant lender did not have a duty "to complete the loan modification process"].)

[7] *Ansanelli v. JP Morgan Chase Bank, N.A.* (N.D.Cal., Mar. 28, 2011, No. C 10–03892 WHA) 2011 U.S. Dist. Lexis 32350, pp. *21–*22 ["allegation that lender offered plaintiffs a loan modification and 'engage[d] with them concerning the trial period plan' was sufficient to create duty of care"]; *Watkinson v. Mortgage IT, Inc.* (S.D.Cal. June 1, 2010) 2010 U.S. Dist. Lexis 53540, pp. *23–24 [duty of care found where bank knowingly misstated borrower's income and value of property on loan application, and where borrower sought but was denied a loan modification]; *Becker v. Wells Fargo Bank, N.A.,* Inc. (E.D.Cal., Nov. 30, 2012, No. 2:10–cv–02799 LKK KJN PS) 2012 U.S. Dist.

*Garcia v. Ocwen Loan Servicing, LLC*, *supra*, 2010 U.S. Dist. Lexis 45375, pages *7–*11, is representative of those cases that have found that the *Biakanja* factors weigh in favor of imposing a duty of care on a lender that undertakes to review a loan for potential modification. The court explained, "Based on the foregoing factors,[the lender] arguably owed Plaintiff a duty of care in processing Plaintiff's loan modification application, as at least five of the six factors weigh in favor of finding a duty of care. [¶] The transaction was unquestionably intended to affect Plaintiff. The decision on Plaintiff's loan modification application would determine whether or not he could keep his home. [¶] The potential harm to Plaintiff from mishandling the application processing was readily foreseeable: the loss of an opportunity to keep his home was the inevitable outcome. Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief. [¶] The injury to Plaintiff is certain, in that he lost the opportunity of obtaining a loan modification and . . . his home was sold. [¶] There is a close connection between Defendant's conduct and any injury actually suffered, because, to the extent Plaintiff otherwise qualified and would have been granted a modification, Defendant's conduct in misdirecting the papers submitted by Plaintiff directly precluded the loan modification application from being timely processed. [¶] The existence of a public policy of preventing future harm to home loan borrowers is shown by recent actions taken by both the state and federal government to help homeowners caught in the home foreclosure crisis. See, e.g., CAL.CIV.CODE § 2923.6 (encouraging lenders to offer loan modifications to borrowers in appropriate circumstances); see also,

---

Lexis 170729, pp. *34–*35 [complaint stated claim against lender for negligence during the loan modification process]; *Crilley v. Bank of America, N.A.* (D. Hawaii, Apr. 26, 2012, No. 12–00081 LEK–BMK) 2012 U.S. Dist. Lexis 58469, p. *29 [denying motion to dismiss because plaintiffs "have pled sufficient facts to support a finding that Defendant went beyond its conventional role as a loan servicer by soliciting Plaintiffs to apply for a loan modification and by engaging with them for several months" regarding the modification]; *Garcia v. Ocwen Loan Servicing, LLC* (N.D. Cal., May 10, 2010, No. C 10–0290 PVT) 2010 U.S. Dist. Lexis 45375, pp. *7–*11 [plaintiff's allegations of lender's conduct in handling application for loan modification pleaded a duty of care].)

Press Release at http://gov.ca.gov/press-release/14871 ("Gov. Schwarzenegger Signs Legislation to Provide Greater Assistance to California Homeowners"), and MakingHomeAffordable.gov (describing the federal "Making Home Affordable Program"). [¶] Whether or not moral blame attaches to this Defendant's specific conduct is not clear at this stage of the proceedings. However, in light of the other factors weighing in favor of finding a duty of care, the uncertainty regarding this factor is insufficient to tip the balance away from the finding of a duty of care."

We find the *Garcia* court's reasoning persuasive and applicable to the facts alleged in the present case. Here, because defendants allegedly agreed to consider modification of the plaintiffs' loans, the *Biakanja* factors clearly weigh in favor of a duty. The transaction was intended to affect the plaintiffs and it was entirely foreseeable that failing to timely and carefully process the loan modification applications could result in significant harm to the applicants. Plaintiffs allege that the mishandling of their applications "caus[ed] them to lose title to their home, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages." As stated in *Garcia,* "Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief." (*Garcia, supra*, 2010 U.S. Dist. Lexis 45375, p. *9.) Should plaintiffs fail to prove that they would have obtained a loan modification absent defendants' negligence, damages will be affected accordingly, but not necessarily eliminated.

With respect to whether defendants' conduct was blameworthy—the fifth *Biakanja* factor—it is highly relevant that the borrowers "ability to protect his own interests in the loan modification process [is] practically nil" and the bank holds "all the cards." (*Jolley, supra*, 213 Cal.App.4th at p. 900.) As explained in the amicus curiae brief filed by Housing and Economic Rights Advocates et al.: "Traditional mortgage lending involved a bank evaluating a borrower and her security, and issuing a loan with terms reflecting the perceived risk that the borrower would default. The same bank would then

23

(i) retain the loan, making its profit on the interest the borrower paid; and (ii) service the loan, meaning that it would be in contact with the borrower directly, collecting the borrower's payments and negotiating any changes in loan terms. *See* Eamonn K. Moran, *Wall Street Meets Main Street: Understanding the Financial Crisis* (2009) 13 N.C. Banking Inst. 5, 32 (" 'Traditionally, banks managed loan "from cradle to grave" as they made mortgage loans and retained the risk of default, called credit risk, and profited as they were paid back.' ") [citation omitted]. [¶] These tasks have been dispersed among different actors in the modern mortgage servicing context, however, changing the relationships between the borrower, the loan originator, the ultimate holder of the loan, and the servicer of the loan. [¶] First, borrowers are captive, with no choice of servicer, little information, and virtually no bargaining power. Servicing rights are bought and sold without input or approval by the borrower. Borrowers cannot pick their servicers or fire them for poor performance. The power to hire and fire is an important constraint on opportunism and shoddy work in most business relationships. But in the absence of this constraint, servicers may actually have positive incentives to misinform and under-inform borrowers. Providing limited and low-quality information not only allows servicers to save money on customer service, but increases the chances they will be able to collect late fees and other penalties from confused borrowers."

The borrower's lack of bargaining power coupled with conflicts of interest that exist in the modern loan servicing industry provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification. Moreover, the allegation in the complaint that defendants engaged in "dual tracking," which has now been prohibited (see Civ. Code, §§ 2923.6, 2924.18) increases the blame that may properly be assigned to the conduct alleged in the complaint. (*Jolley, supra*, 213 Cal.App.4th at p. 901.)

The policy of preventing future harm also strongly favors imposing a duty of care on defendants. As noted in *Jolley*, *supra*, 213 Cal.App.4th at page 903, "[T]he California Legislature has expressed a strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be

24

lost." The "California Homeowner Bill of Rights" (HBOR) (Assem. Bill No. 278; Sen. Bill No. 900 (2011–2012 Reg. Sess.)), which became effective January 1, 2013, demonstrates "a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification." (*Jolley¸* at p. 903.)

Among other things, the HBOR attempts to eliminate the practice, commonly known as dual tracking, whereby financial institutions continue to pursue foreclosure while evaluating a borrower's loan modification application. (Civ. Code, §§ 2923.6, 2924.18.) The HBOR also requires mortgage services to provide borrowers with a single point of contact "responsible for doing all of the following: [¶] (1) Communicating the process by which a borrower may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options. [¶] (2) Coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application. [¶] (3) Having access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of the foreclosure prevention alternative. [¶] (4) Ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any. [¶] (5) Having access to individuals with the ability and authority to stop foreclosure proceedings when necessary." (Civ. Code, § 2923.7, subd. (b).) The HBOR requires further that "When a borrower submits a complete first lien modification application or any document in connection with a first lien loan modification application, the mortgage servicer shall provide written acknowledgement of the receipt of the documentation within five business days of receipt. In its initial acknowledgement of the loan modification application, the mortgage servicer shall include . . . [¶] (1) A description of the loan modification process, including an estimate of when a decision on the loan modification will be made after a complete application has been submitted by the borrower and the length of time the borrower will have to consider an offer of a loan modification or other foreclosure prevention alternative. [¶] (2) Any deadlines, including deadlines to submit missing documentation, that would affect the processing of a first lien

25

loan modification application. [¶] (3) Any expiration dates for submitted documents. [¶] (4) Any deficiency in the borrower's first lien loan modification application." (Civ. Code, § 2924.10, subd. (a).) To enforce the new requirements, the HBOR creates a private right of action allowing a borrower to seek injunctive relief to enjoin a material violation of the act prior to foreclosure and to assert a claim for damages for a violation of the act following foreclosure. (Civ. Code, § 2924.12, subds. (a), (b).)

Although the provisions of the HBOR had not yet become effective at the dates relevant to the present action, the legislation nonetheless "sets forth policy considerations that should affect the assessment whether a duty of care was owed to [plaintiffs] at that time." (*Jolley*, *supra*, 213 Cal.App.4th at p. 905.) Much of the conduct that plaintiffs allege breached a duty of care in this case—failing to process the applications in a timely manner, dual tracking and losing documents—is conduct now regulated by the HBOR. While the explicit articulation of the lender's duties was not available when plaintiffs applied for loan modification, these obligations fall well within the duty to use reasonable care in the processing of a loan modification. Recognizing this general duty will not place an undue burden on mortgage banks and servicers, nor will it have a chilling effect on borrowers' ability to obtain loan modifications.

Defendants' remaining arguments are also without merit. Plaintiffs have sufficiently alleged a breach of the duty of care. Plaintiffs have also alleged that the improper handling of their applications deprived them of the opportunity to obtain loan modifications, which they allege they were qualified to receive and would have received had their applications be properly reviewed, and alternatively, that the delay in processing deprived them of the opportunity to seek relief elsewhere. Finally, plaintiffs' failure to tender the outstanding balances on their loans does not deprive them of standing to pursue their negligence claim. Defendants cite cases holding that tender of the indebtedness is required in an action to set aside a trustee's sale for irregularities in sale notice or procedure. (See e.g., *Arnolds Mgmt. Corp. v. Eischen* (1984) 158 Cal.App.3d 575 [defect in notice of sale]; *Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112 [trustee sold property to a corporation in which trustee was financially

26

interested].) Tender of the unpaid debt is not necessarily required, however, to set aside a sale in other circumstances, including an action seeking relief based on allegedly fraudulent and unlawful business practices relating to the marketing of the subject loan. (See, e.g., *Menan v. U.S. Bank Nat. Assn.* (E.D.Cal. 2013) 924 F.Supp.2d 1151, 1160 ["The law does not require plaintiff to tender the purchase price to a trustee who has no right to sell the property at all."]; *Ohlendorf v. American Home Mortg. Servicing* (E.D.Cal. 2010) 279 F.R.D. 575, 580 [Under California law, borrower was not required to tender loan proceeds before bringing claims against lender and related parties for fraud and violations of the UCL, where borrower asserted no causes of action that relied on any irregularity in mortgage foreclosure sale itself]; *Azzini v. Countrywide Home Loans* (S.D.Cal. Dec. 29, 2009) 2009 U.S. Dist. Lexis 120599 [tender not required where complaint seeks relief based on fraud and unfair business practices].)

5. Plaintiffs have alleged a cause of action against ReconTrust.

Defendants assert that the judgment was improperly entered as to ReconTrust Company because it is "only named as one of the defendants and it is impossible to decipher what ReconTrust is being alleged to have done." Plaintiffs suggest that we should not reach this issue because it was not raised below. Defendants' response that they did raise this issue in the trial court is questionable. Defendants do not cite to the record in support of their assertion that the matter was "set forth in [their] demurrer" and the only reference appears to have been the broad statement in defendants' points and authorities that "plaintiffs' fraud claim is pled against all defendants and fails to identify any individual defendant or their role in the allegedly fraudulent scheme." In all events the complaint alleges that "ReconTrust Company, N.A. is a wholly owned subsidiary of Bank of America." and that ReconTrust performed foreclosure-related activities despite Bank of America's promises that it would review plaintiffs' applications for modification in accordance with HAMP guidelines before engaging in foreclosure activities. Whether or not ReconTrust may be held liable under a theory of joint venture liability or some other theory, the allegations in the complaint are sufficient to put ReconTrust on notice of the basis for the claim against it.

**Disposition**

The judgment is reversed as to plaintiffs' first, second and sixth causes of action and the matter is remanded to the trial court for further proceedings consistent with this opinion. Plaintiffs shall recover their costs on appeal.

_____

Pollak, Acting P. J.

We concur:

_____

Siggins, J.

_____

Jenkins, J.

A138443

28

Counsel for Plaintiffs and Appellants:     Eric Andrew Mercer

    Elizabeth Letcher for Housing and Economic Rights Advocates; J.L. Pottenger, Jr. for Jerome N. Frank Legal Services Organizations; Kent Qian for National Housing Law Project as amicus curiae on behalf of plaintiffs and appellants.


Counsel for Defendants and Respondents:     Bryan Cave LLP
Douglas A. Thompson
Andrea M. Hicks
Katherine A. Keating

A138443